UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:06CR237CEJ(MLM) |
| ) | |
| DAMON LAMONT DOUGLAS, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

On July 7, 2006 this matter came before the court for an Evidentiary Hearing on defendant's Motion to Suppress Physical Evidence. [Doc. 17, 18] The government has filed a written Response. [Doc. 19] At the Hearing, the defendant was present in person and represented by counsel Mr. Patrick Kilgore. The government was represented by Assistant United States Attorney Allison Behrens.

The government presented the testimony of Michael Langsdorf, a Police Officer with the St. Louis Metropolitan Police Department for four years, now assigned to the Third District. Prior to this assignment, he was a detective and worked in an undercover capacity. The defendant presented no evidence. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witness, the undersigned makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

On March 15, 2006 PO Langsdorf and his partner PO Donald Thurmond were on routine patrol in the area of Pestilozzi and Ohio. They were flagged down by Barbara Potts who is a Block Captain. A Block Captain is one who watches the neighborhood and reports on suspicious activities. Both officers had dealt with her before and consider her a reliable source of information. She said she had just seen a black male running down Gravois holding what appeared to be a purse under

his t-shirt. He wore a grey jacket, black t-shirt and jeans. The officers were aware that between December, 2005 and March, 2006 there had been 200-300 robberies in the Third District.

They therefore canvassed the area for other witnesses, a victim of a purse snatching or the perpetrator of a robbery. They went northbound on Ohio then turned onto Gravois. They saw someone meeting the description given by Ms. Potts standing on Gravois by a hair salon/barber shop. When they saw defendant at the barber shop, PO Thurmond recognized defendant because both officers had had contact with defendant one-two years before. Defendant was talking to another individual in the doorway of the shop. They made a U-turn for the purpose of making an investigatory stop and they curbed their car in front of the shop.

PO Thurmond exited the marked police vehicle and approached defendant. Defendant saw PO Thurmond coming and fled on foot. He ran approximately half a block southwest on Gravois then north on Ohio. PO Thurmond re-entered the police vehicle and the officers followed defendant in their car. Defendant was running on the left side of the street, on the sidewalk. On his left was a church which took up approximately one half to three fourths of the block. The church was on one side of defendant and the police vehicle was on the other side. Suddenly defendant stopped running northbound, and turned around and ran southbound. PO Langsdorf put the car in reverse and followed him back to the intersection. Defendant tried to cross Gravois but was unable to do so because of the traffic. He then ran back northbound on Ohio, past the church to a vacant lot which he cut across.

PO Thurmond exited the vehicle again and gave chase on foot. As PO Thurmond chased defendant across the vacant lot, he yelled for defendant to stop however, defendant did not comply. PO Langsdorf parked the car and also gave chase. He was a little behind defendant and PO Thurmond. He observed defendant throw a plastic baggie from his left hand onto the ground. About five feet later, PO Thurmond tackled defendant. PO Langsdorf placed defendant in custody and in handcuffs for officer safety. PO Thurmond retrieved the baggie while PO Langsdorf obtained a pedigree from defendant. PO Langsdorf wrote it down but also had a shoulder microphone and

relayed information to the dispatcher. He asked for another responding officer. It is standard procedure when there has been resisting arrest by flight to call for a second responder. PO Thurmond informed PO Langsdorf that the baggie contained individually wrapped pieces of what appeared to be crack cocaine. Based on both officers' experience, they were able to recognize the crack cocaine.

Defendant was taken to the police vehicle at approximately the same time as PO Aaron Jackson arrived. Also on the scene were approximately five relatives of defendant. They were giving the officers a great deal of trouble. Defendant was placed in the police car to separate him from the relatives. PO Jackson and PO Thurmond attempted to maintain control of the crowd. PO Langsdorf was in the car with defendant and did a computer check and learned that he had five outstanding warrants. He was placed under arrest for the warrants and for Violation of the Missouri Controlled Substance Law (VMCSL). Although no evidence was adduced at the hearing regarding search of defendant incident to his arrest, the government's Response indicates that he was searched incident to his arrest and an amount of U.S. currency was found on his person. The money was seized. Defendant was advised of his <u>Miranda</u> Rights by reading from the department-issued card:

The St. Louis Metropolitan Police Department Card states the following:

Warnings -- Constitutional Rights

1. You have the right to remain silent.
2. Anything you say can and will be used against you in court.
3. You have the right to a lawyer and to have him with you while you are being questioned.
4. If you cannot afford to hire a lawyer, one will be appointed for you before any questioning if you so desire.

He asked defendant if he understood his rights and defendant responded that he did together with profanity, to the effect of "F_ _ _ you. I know what I am doing." PO Langsdorf did not ask defendant any questions. Defendant spontaneously said "You're free casing me. Those aren't my drugs."

Defendant's family was not under control. Therefore, defendant was taken approximately two blocks away while the officers waited for a supervisor to arrive. Normally, they would wait at the scene but here, because of the disruption by the family, they believed it was safer to move defendant two blocks away to Gravois and Jefferson to a 7-11 shop. The supervisor arrived as did Barbara Potts. She observed defendant in the police car and volunteered that defendant was the one she saw running with what appeared to be a purse.

Defendant was transported to the patrol station and PO Langsdorf booked him. Defendant's family also arrived at the patrol station and eventually the Lieutenant had to issue summonses to them for interfering with an arrest. No statements were made by defendant at the station.

No victim of a purse snatching was located. No calls were made to the dispatcher regarding a purse snatching.

## CONCLUSIONS OF LAW

1. **Initial Approach**

"Not all personal encounters between law enforcement officials and citizens falls within the ambit of the Fourth Amendment". United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001).

Police officers may approach an individual in a public place to ask if the person is willing to answer questions, and the officers may put questions to the person if he is willing to answer. Florida v. Royer, 460 U.S. 491, 497 (1983). Such encounters do not infringe upon any Fourth Amendment rights, and do not, therefore, require any degree of suspicion. Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984). Officers need "no basis for suspecting a particular individual [to] ask questions of that individual, ask to examine the individual's identification, and [even] request consent to search his or her luggage--as long as the police do not convey a message that compliance with their requests is required." Florida v. Bostick, 501 U.S. 429, 435 (1991) (citations omitted).

PO Thurmond merely approached defendant and defendant immediately took off running. At that time, clearly there was no seizure nor was the Fourth Amendment implicated in any way.

There is no seizure of a suspect during the period of time a suspect refuses to stop for the police. United States v. Hodari D., 499 U.S. 621, 629 (1991). "The word 'seizure'...does not remotely apply...to the prospect of a policeman yelling 'stop, in the name of the law!' at a fleeing form that continues to flee." Id. at 626; see also United States v. Jackson, 175 F.3d 600, 601 (8th Cir. 1999) citing Hodari D., for the proposition that no seizure occurs until physical application of force by officer or submission to officer's assertion of authority. Defendant was not "seized" in a Fourth Amendment sense until PO Thurmond tackled him.

**2.    Abandonment**

As defendant ran he threw a baggie of crack cocaine to the ground. He cannot challenge the seizure of the narcotics because warrantless searches and seizures of abandoned property do not violate the Fourth Amendment. United States v. Segars, 31 F.3d 655, 658 (8th Cir. 1994). Whether a person intends to abandon property may be inferred from words spoken, acts done and other objective facts, and all relevant circumstances at the time of alleged abandonment should be considered. United States v. Hoey, 983 F.2d 890, 892 (8th Cir. 1993). The issue is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished a reasonable expectation of privacy so that a search and seizure is valid. Id. Abel v. United States, 362 U.S. 217, 241 (1960); United States v. Ruiz, 935 F.2d 982, 984-85 (8th Cir. 1991).

"Whether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent." United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997) cert. denied, 522 U.S. 1061 (1998). "Two important factors are denial of ownership and physical relinquishment of the property." Id., quoting United States v. Nordling, 804 F.2d 1466, 1469 (9th Cir. 1986). Considering only the information available to the officers at the time of the search, Tugwell, 125 F.3d at 602, they knew defendant threw the baggie on the ground and continued running away from it. Clearly defendant

was attempting to deny ownership and had completely relinquished the property. The narcotics should not be suppressed.

**3. Arrest**

The officers saw defendant flee, throw down a bag of narcotics, and continue to flee. Clearly they had probably cause for a warrantless arrest.

Law enforcement officers may arrest a person without a warrant if they have probable cause to believe that the person has committed or was committing a crime. Gerstein v. Pugh, 420 U.S. 103 (1975); United States v. Watson, 423 U.S. 411 (1976). Probable cause for arrest exists if at the time of the arrest the facts and circumstances within the knowledge of the officers and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the person had committed or was committing an offense. Beck v. Ohio, 379 U.S. 89, 91 (1964). See also R.S.Mo. § 544.216 (a municipal law enforcement officer may arrest on view without a warrant any person about whom he has reasonable grounds to believe has violated any law of this state). The officers saw defendant throw down the drugs. In addition, defendant's flight from the police provided corroborating information to the probable cause for arrest. United States v. Wallace, 102 F.3d 346, 348 (8th Cir. 1996) (citing United States v. Wadley, 59 F.3d 510, 512-13 (5th Cir. 1995) for the proposition that in combination with other facts and circumstances, flight from an officer may create probable cause where defendant persistently attempts to evade capture). Defendant's arrest was therefore lawful.

**4. Search Incident**

The government's response states that defendant was searched incident to his arrest. Although there was no evidence of this search at the Evidentiary Hearing, the court finds that because a search incident is such a routine part of any and every arrest, it is fair to conclude that it took place. The search of defendant's person was lawful because it was incident to his lawful arrest. Chimel v. California, 395 U.S. 752, 763 (1969); United States v. Robinson, 414 U.S. 218, 235

(1973); New York v. Belton, 453 U.S. 454 (1981). Therefore, the currency found on defendant's person should not be suppressed.

5. Statements

Defendant was fully advised of his Miranda Rights by PO Langsdorf, reading defendant his rights from the department-issued card as more fully set out in the Findings of Fact above.

A defendant may knowingly and intelligently waive his rights and agree to answer questions. Miranda v. Arizona, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of the Miranda Rights by the defendant. Colorado v. Connelly, 479 U.S. 157 (1986). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry" Dickerson v. United States, 530 U.S. 428, 444 (2000). The court must look to the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986).

The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Haynes v. Washington, 373 U.S. 503 (1963); Colorado v. Connelly, 479 U.S. at 170. However, as the Supreme Court stated in Berkemer v. McCarthy, 468 U.S. 420 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." Id. at 433 n. 20; Dickerson, 530 U.S. at 444.

Defendant was not questioned after being advised of his rights. He blurted out a statement about the drugs not being his. Volunteered statements are not barred by the Fifth Amendment. In fact, "the Supreme court in Miranda expressly stated that '[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admission is not affected by our holding today.'"

<u>United States v. Butzin</u>, 886 F.2d 1016, 1018 (8th Cir. 1989) <u>quoting</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 478 (1966).  Defendant's statements should be admitted.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Physical Evidence be **DENIED**. [Doc. 17, 18]

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

<u>/s/Mary Ann L. Medler</u>
**MARY ANN L. MEDLER**
**UNITED STATES MAGISTRATE JUDGE**

Dated this  14th  day of  July, 2006.